STEPHANIE HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KEVIN RUBINO (CABN 255677)
Assistant United States Attorney

    450 Golden Gate Avenue
    San Francisco, California 94102
    Telephone: (415) 436-7291
    FAX: (415) 436-7234
    Kevin.Rubino@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 20-CR-00479 EMC |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | Date: April 14, 2021 |
| DARRIOUS YORK, | Time: 9:00 a.m. |
| Defendant. | Court: Honorable Edward M. Chen |

I.    **INTRODUCTION**

The defendant Darrious York is pleading guilty to one count of violating 18 U.S.C. § 922(g)(1), but this is not an ordinary felon in possession case. Mr. York was not merely found in possession of a firearm. He was openly negotiating the purchase of a gun on the streets of the Bayview neighborhood of San Francisco. And when he was confronted by the police, he sprinted away, with a loaded pistol in his hand. If Mr. York had not stumbled and fell during the ensuing chase, there could have been an armed confrontation with the police, with dire consequences for Mr. York, the arresting officers, and anyone unlucky enough to be in the area that night.

U.S. SENTENCING MEMORANDUM
20-CR-00479 EMC

1

Likewise, Mr. York is not an ordinary felon.  He is a member of the deadly Big Block gang who, at 40 years old, has already accumulated 10 felony convictions, including two convictions for felon in possession of a firearm in 2016 and 2019.  During one of those incidents, Mr. York led the police on a high-speed car chase through the streets of Oakland.  During the other, he shot and killed a man.  For those two crimes, Mr. York was sentenced to two years and six years in prison, respectively.  To say that he has been undeterred would be a gross understatement.

On these facts, it is difficult to imagine how a below guidelines sentence could be justified.  Mr. York's upbringing was undeniably tragic, and the government hopes he will receive the mental health and drug treatment he needs while in custody.  But in the meantime, the community must be protected from Mr. York.  In addition, he and his fellow gang members must be made to understand that trafficking guns in the streets of San Francisco has consequences.  For these reasons, the government believes a sentence of 86 months, which is at the middle of the guidelines range for Mr. York's crime, is sufficient, but not greater than necessary, to protect the community and satisfy the needs of general deterrence.

## II.   DEFENDANT'S OFFENSE CONDUCT

On the night of July 22, 2020, Mr. York was spotted by two San Francisco Police Department officers who were patrolling the Bayview neighborhood in plainsclothes.  PSR ¶ 6.  Mr. York was standing on the sidewalk talking to another individual when one of the officers overheard him say "gun" and "I want to buy. . ."  *Id*. ¶ 8.  When Mr. York noticed that someone was listening to his conversation, and recognized that person as a police officer, he sprinted down 3rd Avenue away from the officer.  *Id*. ¶¶ 10–11.  As the two officers chased Mr. York, he pulled a loaded Smith and Wesson pistol from a holster and carried it in his hand as he ran.  *Id*. ¶ 12.  Mr. York soon stumbled and fell, dropping the gun, and was tackled by one of the officers.  *Id*. ¶ 13.

## III.   HISTORY AND CHARACTERISTICS OF DEFENDANT

At 40 years old, Mr. York has been arrested more than 60 times and convicted of six misdemeanors and 10 felonies.  The sheer number of Mr. York's arrests and convictions reflects a flagrant disregard for law enforcement and a thoroughly criminal lifestyle.  His behavior in recent years

U.S. SENTENCING MEMORANDUM                    2
20-CR-00479 EMC

suggests that, if anything, Mr. York's propensity for violence is escalating and the threat he poses to the community is more acute than ever.

**A.     In 2014, York Shot and Killed a Man in the SoMa Neighborhood of San Francisco.**

On July 22, 2014, at about 5:00 a.m., Mr. York shot and killed an 18-year-old named Daniel Beltran outside a single-room occupancy hotel in SoMa.  The shooting escalated from a fight, during which Mr. York pistol-whipped Beltran's companion.  Mr. York then fired one shot toward Beltran, who was hit in the chest and died shortly thereafter.  The incident was captured on surveillance footage, but Mr. York claimed he acted in self-defense.  According to Mr. York, the cameras failed to capture the threats made against him that precipitated the confrontation.  A jury acquitted Mr. York on the murder charge but convicted him of felon in possession of a firearm in violation of Penal Code § 29800(a)(1). He was sentenced to 6 years in prison.

**B.     In 2018, York Fled From Police on a High-Speed Car Chase Through Oakland with a Loaded Pistol in the Car.**

On January 2, 2018, Mr. York led the police on a high-speed chase through Oakland with a loaded Glock pistol in the car.  The incident began when the Oakland Police Department was conducting surveillance outside a residence in preparation for executing a narcotics-based search warrant.  While they were surveilling that location, Mr. York walked out with another individual.  They both got into a Kia Optima, with Mr. York in the driver's seat, despite that Mr. York's driving privileges were suspended.  When Mr. York drove away, the surveillance team notified other officers of the description and license plate number of the Kia, so that Mr. York and his companion could be stopped and questioned about their connection to the residence.

Oakland officers driving a fully marked police vehicle located the Kia Mr. York was driving and activated their lights and sirens in an attempt to pull him over.  Mr. York accelerated away from the officers at high speed.  In the ensuing chase, Mr. York ran two red lights and swerved into oncoming traffic.  He was driving so recklessly to evade the police that they decided to discontinue their pursuit for the sake of public safety.

Minutes later, Mr. York returned to the residence being surveilled and ran inside holding what appeared to be a Glock-style pistol with an extended magazine.  The residence was searched and the

U.S. SENTENCING MEMORANDUM                    3
20-CR-00479 EMC

occupants arrested, including Mr. York.  During the search, the officers found the .40 caliber Glock pistol that Mr. York had been carrying.  It was loaded with 17 rounds of ammunition.  A subsequent record check for the pistol showed it had been stolen.  The officers also searched the Kia that Mr. York had taken on a high-speed chase through Oakland.  In the center console, they found 30 pills of oxycodone and 9 individually wrapped bags of suspected heroin.  In connection with this arrest, Mr. York pled guilty to felon in possession of a firearm in violation of Pen. Code § 29800(a)(1).  He was sentenced to two years in prison.

The instant offense is therefore the third time in five years that Mr. York has been arrested with a loaded firearm.  In all three cases, Mr. York's illegal gun possession led to extremely dangerous conditions, not just for himself and the other criminals with whom he associates, but for the surrounding community as well.

**IV.     SENTENCING RECOMMENDATION**

The United States agrees with the summary of the statutory penalties and sentencing calculation set forth in the presentence report.  Given his Offense Level of 21, and Criminal History Category of VI, Mr. York's guidelines range is 77 to 96 months.  PSR ¶ 124.   The government does not agree, however, that Mr. York's childhood neglect and struggles with mental health and drug addiction justify a downward variance.

In this case, there are several aggravating factors that are relevant to the sentencing decision:  the details of Mr. York's current offense, his long criminal history, and his stubborn insistence on continuing to buy and use guns, no matter how many times he is caught and punished.  Three felon-in-possession convictions in five years reflects an extraordinary disregard for the criminal justice system and a flagrant refusal to reform his behavior.  Moreover, Mr. York has been a professional criminal his entire adult life, never having held lawful employment.  PSR ¶ 119 ("The defendant has been unemployed throughout his life…").  His conduct to date has provided little reason to doubt that, as soon he is released from custody, he will return to his criminal lifestyle.

Given these factors, a sentence above the guidelines range would be justified.  Mr. York's personal story is unfortunate and sad.  But, at most, these personal challenges partially offset the many aggravating factors in this case, which still place him well within the guidelines range for this crime.

U.S. SENTENCING MEMORANDUM                    4
20-CR-00479 EMC

## V.    PROBATION'S GUIDELINES CALCULATION IS CORRECT, CONTRARY TO DEFENSE'S OBJECTIONS.

The defendant objects to Probation's guidelines calculation on the basis that one of the two prior "controlled substance offenses" has not been sufficiently established because the conviction record does not name the substance Mr. York was trafficking.  PSR ¶ 23.  To be clear, the defense does not deny that Mr. York was in fact convicted of two qualifying felonies.  Mr. York knows what controlled substances he was convicted of trafficking, and there is no question that those substances are regulated by the Controlled Substances Act and therefore qualify as "controlled substance offenses."  If Mr. York had a contrary understanding, he would say so.

Instead, Mr. York's argument is that the government and Probation cannot rely on the certified transcript of his preliminary hearing—as distinguished from the certified conviction record—to identify the controlled substance at issue.  This is a purely technical defense, which fails even on its own terms.

Mr. York has no fewer than seven felony convictions for drug trafficking dating back to 1998.  PSR ¶¶ 35, 36, 39, 40, 43, 44, 46, 50.  Two of those qualify as "controlled substance offenses" justifying a base offense level of 24 under USSG § 2K2.1.  *Id*. ¶¶ 43, 46.  First, in 2007, Mr. York was convicted of possession of cocaine base for sale in violation of California Health & Safety Code § 11351.5.  *Id*. ¶ 43.  Second, in 2011, Mr. York was convicted of possession of cocaine salts for sale in violation of California Health & Safety Code § 11351.  *Id*. ¶ 46.  As to this second conviction, Mr. York claims the government has not established that the substance at issue was "cocaine salts."

There is no factual dispute that the substance was indeed cocaine salts.  The certified conviction documents show that Mr. York pled guilty to Count 3 for violation of Health & Safety Code § 11351, and the certified transcript of the preliminary hearing shows that Count 3 for violation of Health & Safety Code § 11351 arose from Mr. York's possession with intent to distribute cocaine salts.

Instead, Mr. York claims that, as a legal matter, a certified preliminary hearing transcript is not a document the Court can rely on for a sentencing enhancement under the Supreme Court's ruling in *Shepard v. United States*, 544 U.S. 13 (2005).  Mr. York is wrong.  In *Shepard*, the Supreme Court explained that, when determining whether a sentencing enhancement applies, a court may look to "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge

U.S. SENTENCING MEMORANDUM                5
20-CR-00479 EMC

and defendant in which the factual basis for the plea was confirmed by the defendant, <u>or to some comparable judicial record of this information</u>." *Id*. at 26 (emphasis added).  Since then, several courts have ruled that a certified transcript of a preliminary hearing is properly considered when determining whether a sentencing enhancement applies.  *See, e.g., Ramos v. Hall*, No. CV 06-2867-AHM AJW, 2010 WL 2353383, at *5 (C.D. Cal. Apr. 20, 2010), report and recommendation adopted, No. CV 06-2867 AHM AJW, 2010 WL 2353382 (C.D. Cal. June 7, 2010) ("[A] fair reading of *Shepard* suggests that a certified transcript of a preliminary hearing is the type of 'judicial record' that a trial court could permissibly rely upon in inquiring into the facts underlying a prior conviction. A preliminary hearing transcript reflects judicial proceedings held in the presence of the defendant, who typically is represented by counsel, and who has an opportunity to cross-examine witnesses against him."); *see also United States v. Harvey*, 305 F. Supp. 859, 863 (3d Cir. 2009) ("The guilty plea to the information, taken together with the preliminary hearing transcript, is a reliable indicator of the nature of the crime."), *but see United States v. Medina-Almaguer*, 559 F.3d 420 (6th Cir. 2009).

The Ninth Circuit has not ruled on this specific issue, but it has held that a document far less reliable than a certified preliminary hearing transcript may properly form the basis of a sentencing enhancement.  *United States v. Strickland*, 601 F.3d 963, 968 (9th Cir. 2010).  In *Strickland*, the Ninth Circuit ruled that it was appropriate for the district court to rely for this purpose on an uncertified docket sheet from a state court in Maryland.  *Id*. at 968.  For a number of reasons, an uncertified state-court docket sheet is far more prone to error than a certified preliminary hearing transcript.

First, a preliminary hearing is attended by the defendant and his counsel, who have an opportunity to correct any inaccuracies in the record, and a strong motive to do so.  The transcript of that proceeding is then prepared by a court reporter, who was present for the sworn testimony, and who certified its accuracy.  A docket sheet, on the other hand, is prepared by a clerk who may have received the information second or third hand and who does not attest to its accuracy.  *Strickland*, 601 F.3d at 975–76 ("The process of transposing information onto docket sheets can result in error far more frequently than contemporaneous recording of judicial events by a direct observer.  Indeed, errors on docket sheets are so common that courts often assume discrepancies between conflicting documents have resulted from a clerical error on a docket sheet entry. ") (Berzon, Schroeder, Reinhardt, dissenting).

U.S. SENTENCING MEMORANDUM                6
20-CR-00479 EMC

Moreover, the defendant and his lawyer may not have seen this docket entry and, even if they did, would have little incentive to correct any inaccuracies. After all, unlike statements on the record at a preliminary hearing, a court is not going to make a substantive determination about the criminal charges based on a docket sheet entry. Thus, the Ninth Circuit's ruling in *Strickland* compels the conclusion that a certified preliminary hearing transcript provides a proper basis for the application of a sentencing enhancement.

In an attempt to inject some uncertainty into the analysis, Mr. York has floated the hypothetical possibility that the factual basis for Count 3, which was identified during the preliminary hearing as possession of cocaine salts for sale, may have changed by the time of his guilty plea. The idea seems to be that, at some point after the preliminary hearing, the prosecutor changed the controlled substance that was the basis for Count 3, rather than adding a new count. This proposal is entirely speculative and, frankly, implausible. Moreover, Mr. York knows this did not happen, or he would say so.

But, most importantly, it would not matter even if it were true. That is because the preliminary hearing transcript shows that all the drugs in Mr. York's possession (heroin, methamphetamine, cocaine salts and marijuana) were regulated by the Controlled Substances Act. Therefore, even if the basis for Count 3 somehow changed between the preliminary hearing and the final plea, any conduct that Count 3 could conceivably cover would qualify for the sentencing enhancement. Mr. York's challenge to Probation's guidelines calculation is meritless and should be disregarded.

## VI.   <u>CONCLUSION</u>

For all these reasons, the government recommends that the Court impose a mid-guidelines sentence of 86 months imprisonment followed by three years of supervised release. Mr. York is a violent recidivist who has repeatedly put the public at grave risk. He has refused to alter his dangerous behavior, despite repeated arrests and prison sentences. A sentence below the guidelines range would send the wrong message to Mr. York, his associates, and the community.

DATED: April 7, 2021

Respectfully submitted,

STEPHANIE HINDS
Acting United States Attorney


*/s/ Kevin Rubino*
KEVIN RUBINO
Assistant United States Attorney