GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California
ELISSE LAROUCHE
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:       elisse_larouche@fd.org

Counsel for Defendant York

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | **Case No.:** CR 2020–479 EMC |
|---|---|
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | **Court:**           Courtroom 5, 17th  Floor |
| DARRIOUS YORK, | **Hearing Date:**   April 14, 2021 |
| Defendant. | **Hearing Time:**   10:30 a.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITIES .........................................................................................................i

INTRODUCTION ........................................................................................................................1

BACKGROUND ..........................................................................................................................1

ARGUMENT ...............................................................................................................................2

    I.     Mr. York's History and Characteristics Merit a Downward Variance or Departure........2

          A.     Mr. York Had a Challenging Upbringing and Introduction to Substance Abuse Began When he Witnessed his Parents' Addiction.................................................2

          B.     Mr. York Has Never Received Substance Abuse Treatment and Desperately Wants it, in Addition to Mental Health Treatment. .................................................3

          C.     Mr. York Has Serious Medical Conditions, Including Sarcoidosis of the Lung, Obesity, Asthma, and High Blood Pressure That Have Made his Time in Custody During the Pandemic More Severe and his Safety and Life Remain at Risk While he is in Custody.................................................................................5

    II.    The PSR Incorrectly Calculates Mr. York's Base Offense Level Because the Government Has Not Met Its Burden to Show the Second Cited Offense is a "Controlled Substance Offense".................................................................................................7

    III.   Even if the Court Finds the Base Offense Level is 21, a Variance is Warranted Because the Significant Impact of the Sentencing Enhancements is a Disproportionate Penalty 12

    IV.   A Downward Variance is Warranted Because African American Men are Disproportionately Convicted and Incarcerated for Firearm Possession (18 U.S.C. § 3553(a)(6)) .................................................................................................................13

    V.    Mr. York's Present Offense is Serious, but is Best Understood in the Context of his History of Addiction, Which Also Explains his Criminal History. .................................16

    VI.   The Court Should Consider Mr. York's Caretaking Responsibilities of his 94-year-old Father in Finding a Departure or Variance is Warranted.................................................17

    VII.  Mr. York Objects to the Scope of the Recommended Condition Three, the Search Condition, Because Allowing for a Search of his Computer/Cellphone is a Greater Deprivation of his Liberty than Necessary. .................................................................18

CONCLUSION...........................................................................................................................19

# TABLE OF AUTHORITIES

**Federal Cases**

*Descamps v. United States*,
570 U.S. 254 (2013) ............................................................................. 10, 11, 12

*Lopez v. Sessions*,
901 F.3d 1071 (9th Cir. 2018) ........................................................................ 9

*Marinelarena v. Barr*,
930 F.3d 1039 (9th Cir. 2019) (en banc) ..................................................... 12

*Medina-Lara v. Holder*,
771 F.3d 1106 (9th Cir. 2014) ........................................................................ 8

*Riley v. California*,
573 U.S. 373 (2014) ...................................................................................... 19

*Shepard v. United States*,
544 U.S. 13 (2005) ..................................................................... 9, 10, 11, 12

*United States v. Bare*,
806 F.3d 1011 (9th Cir. 2015) ...................................................................... 19

*United States v. Leal-Vega*,
680 F.3d 1160 (9th Cir. 2012) ........................................................................ 8

*United States v. Lee*,
687 F. App'x 584 (9th Cir.) ........................................................................... 19

*United States v. Medina-Almaguer*,
559 F.3d 420 (6th Cir. 2009) .................................................................. 11, 12

*United States v. Napulou*,
593 F.3d 1041 (9th Cir. 2010) ...................................................................... 19

*United States v. Romero-Rendon*,
220 F.3d 1159 (9th Cir. 2000) ..................................................................... 8T

*United States v. T.M.*,
330 F.3d 1235–40 (9th Cir. 2003)(a) ........................................................... 19

**Federal Statutes**

18 U.S.C. § 3553 .................................................................................. 4, 13, 19

18 U.S.C. § 3583 ........................................................................................... 19

**State Cases**

*People v. Gallardo*,
4 Cal. 5th 120 (2017) .............................................................................. 10, 11

**Other**

U.S.S.G. §2K2.1 .................................................................................................. *passim*

U.S.S.G. §4B1.2 .................................................................................................. 8

U.S.S.G. §5H1.6 .................................................................................................. 18

1

**INTRODUCTION**

2      Mr. York is a 40-year-old African American man who is before the Court for possession of a

3   firearm as a convicted felon. He accepts full responsibility for his offense. Having been in custody

4   since July 2020, through the height of the pandemic, he has finally accepted that he cannot run from

5   or deny his 20-year-long substance abuse problem. His addiction has again torn him away from his

6   family, including his 94-year-old father for whom he provides care. Mr. York wants substance abuse

7   treatment to make the much-needed and overdue change in his life. A sentence of 36 months custody

8   followed by release to intensive substance abuse treatment is sufficient but not greater than necessary

9   to achieve the aims of sentencing.

10

**BACKGROUND**

11      Mr. York grew up in San Francisco and was exposed early on to substance abuse through his

12   family. His mother was a drug user who only occasionally was present in his life. His father raised

13   him, but was a drug user himself. Mr. York came into the criminal justice system early on at just 15

14   years old for taking a vehicle and possessing marijuana for sale. At the same time, he began using

15   marijuana. In his 20s, his substance use escalated to heroin and methamphetamine. Since then, his life

16   has been marred by addiction. Mr. York has never received substance abuse treatment and has

17   realized he desperately needs it.

18      Mr. York also suffers from serious health problems that place him at greater risk of becoming

19   severely ill or dying form COVID-19. He is obese, has high blood pressure, has sarcoidosis of the

20   lungs, and asthma. He has endured a more severe custodial experience during the pandemic as he has

21   often been isolated and quarantined due to his high-risk factors. His health and safety remain in

22   jeopardy while he is in custody.

23      The presentence investigation report calculated Mr. York's Criminal History Category at VI,

24   which the defense does not object to. However, there is an unresolved dispute as to the offense level

25   calculation. Probation has calculated Mr. York's offense level at 24, citing to two prior offenses it

26   deems controlled substances offenses. PSR ¶ 23. The defense contends that the second cited offense

27   does not constitute a controlled substance offense that would trigger the higher offense level. The

28   2011 California Health and Safety Code (CHSC) conviction for § 11351 possession or purchase for

sale narcotics, is not categorically a controlled substance offense and the government has failed to meet its burden and show the offense is such in this case. The impact is significant. The PSR calculates a final offense level of 21 and guideline range of 77 to 96 months. PSR ¶ 124. But, if the Court agrees with the defense, the guideline range is 51 to 63 months.[1] However, even if the Court disagrees with the defense, the Court should vary downward because of the disproportionate effect of the two cited prior drug offenses from nearly 10 years ago. But for those offenses, Mr. York would have a guideline range of 30 to 37 months. For reasons related to the guidelines, Mr. York's history and characteristics, and the need to avoid racial disparities as outlined below, Mr. York respectfully requests that the Court depart and/or vary downward to 36 months custody.

## ARGUMENT

**I.    Mr. York's History and Characteristics Merit a Downward Variance or Departure**

### A.    Mr. York Had a Challenging Upbringing and Introduction to Substance Abuse Began When he Witnessed his Parents' Addiction

Mr. York was surrounded by substance abuse from a young age and likely, in utero. PSR ¶¶ 89–92. His mother and father were not together after his birth. PSR ¶ 87. Instead, he was primarily raised by his father and his sister, Carolyn, who was 26 years older. PSR ¶ 89–90. Mr. York's mother used crack and drank alcohol throughout his childhood, including when she was pregnant with him. PSR ¶ 89. When Mr. York did spend time with his mother, he remembers she would bring him with her to "crack houses," where everyone was using drugs. PSR ¶ 90. She would leave him there alone as she got lost in her addiction. *Id*. He recalls his mother as a "dysfunctional addict," and uses this characterization in comparison to his father, also an addict, but whom he characterizes as a "functional addict." PSR ¶¶ 89–90. Mr. York considered his dad his "superman." PSR ¶ 90. His father often found him and saved him from crack houses when his mother left him alone. *Id*. He cared for him, made sure he had something to eat, and clean clothes to wear. PSR ¶ 91.

Mr. York eventually realized his father was an addict when he saw him using substances. He also saw substance abuse in the woman his father later married, Rose, who regularly abused alcohol. PSR ¶ 92. Despite his father and Rose's substance abuse, he felt they provided for him and treated

---

[1] U.S.S.G. §2K2.1(a)(4), offense level 20 for one prior controlled substance offense, -3 for acceptance, resulting in offense level 17.

him well. *See* PSR ¶¶ 91–92. Sadly, when Mr. York was eight years old, he found Rose on the couch at home dead. PSR ¶ 94. This experience was deeply traumatic for Mr. York who had enjoyed the motherly love and care that Rose provided to him. *Id*.

Growing up, Mr. York witnessed domestic violence when his mother and father used drugs and would get into arguments. PSR ¶ 93. His mother was often physically violent toward his father and his father would hit back. *Id*. He recalls this fighting being so frequent, he normalized it. *Id*. Mr. York would also face corporal punishment when he misbehaved—he was hit with a belt, extension cord, or anything else his father found handy. PSR ¶ 95.

Mr. York's childhood experiences—living with family members who abused substances, experiencing the abandonment of his mother, witnessing domestic violence, and being the subject of corporal punishment—are some of what have been called "Adverse Childhood Experiences."[2] Accordingly to the ACEs study, the more challenging one's childhood as measured by the ACE factors, the more likely there will be lasting, negative effects on mental and physical health as well as educational and employment life opportunities.[3] "ACEs and associated social determinants of health, such as living in under-resources or racially segregated neighborhoods . . ., can cause toxic stress," which in turn, can alter brain development and hinder one's decision-making and response to stress.[4] In short, when a child is experiencing chronic stressors and adverse experiences like Mr. York experienced, he is starting life at an extreme disadvantage. Mr. York's brain became hardwired for self-preservation as he was subjected to these conditions from an early age.

**B.      Mr. York Has Never Received Substance Abuse Treatment and Desperately Wants it, in Addition to Mental Health Treatment**

The effects of Mr. York's childhood are evidenced in his mental health and substance abuse issues. As a child, he was diagnosed with ADHD and struggled in school. PSR ¶ 107. In his teens, Mr. York began experimenting with alcohol and marijuana. PSR ¶ 111. His drug use did not truly

---

[2] Laura Starecheski, *Take the ACE Quiz – And Learn What It Does and Doesn't Mean*, NPR, Mar. 2, 2015, https://www.npr.org/sections/health-shots/2015/03/02/387007941/take-the-ace-quiz-and-learn-what-it-does-and-doesnt-mean

[3] *See id*; CDC, *Preventing Adverse Childhood Experiences*, https://www.cdc.gov/violenceprevention/aces/fastfact.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fviolenceprevention%2Facestudy%2Ffastfact.html

[4] CDC, *Preventing Adverse Childhood Experiences*.

escalate until around age 20, when he began using cocaine and heroin, which has used nearly daily for the past 20 years. PSR ¶ 112. In his late 30s, Mr. York began using methamphetamine and Fentanyl. PSR ¶¶ 112–13. His Fentanyl use manifested in near death experiences after six overdoses. PSR ¶ 112. Along with his substance abuse disorders, in 2011, he was diagnosed with depression and anxiety and prescribed medication. PSR ¶ 108.

Despite his severe history of substance abuse, Mr. York has never participated in substance abuse treatment. PSR ¶ 114. Mr. York is mindful of his own role in that fact. Previously, he would be offered treatment, but elected to take the time because time was easier to do and he was in denial and ashamed to be labeled a "drug addict." PSR ¶ 114.

A factor for the Court to consider in sentencing is the need for the sentence imposed to provide the defendant with correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(D). Here, Mr. York needs substance abuse treatment and wants such treatment. PSR ¶ 115. Addressing his long-term substance abuse is necessary for Mr. York to make a break with his prior criminal history and live a law-abiding life. Mr. York wants to address his mental health and prior traumatic experiences in life with other tools rather than drugs. *Id*. He also realizes, there is no benefit to denying his substance abuse. He stated "I'm tired of lying to myself, putting up a facade, I'm tired of being distant from my family members" due to his drug use. PSR ¶ 115. While Mr. York was accepted by New Bridge while pending resolution of this case, unfortunately, he was not permitted pre-trial release to realize this opportunity. During the pandemic, substance abuse treatment programming has been stalled at Santa Rita Jail and thus, Mr. York has not been able to avail himself to any resources on that front. While the Bureau of Prisons are offering some programming at some facilities, there is no guarantee that Mr. York will get the treatment he needs once sent to a BOP facility. The most effective way to achieve the sentencing goal of providing Mr. York with needed correctional treatment is for him to participate in an intensive inpatient treatment program upon release from custody, followed by intensive outpatient treatment.

**C.     Mr. York Has Serious Medical Conditions, Including Sarcoidosis of the Lung, Obesity, Asthma, and High Blood Pressure That Have Made his Time in Custody During the Pandemic More Severe and his Safety and Life Remain at Risk While he is in Custody**

Mr. York has been detained since July 2020, during which his health and safety have been put at significant risk in the midst of the COVID-19 pandemic. Mr. York's specific health conditions place him at higher risk of severe illness or death should he contract COVI-19. With the continued concern of COVID-19, including new strains and rising case numbers, his health will continue to be placed at risk for any prison term he must serve.

Mr. York is obese. PSR ¶ 106, Larouche Decl. Ex. A at 5–6. The CDC's guidance states that obesity increases one's risk of severe illness from COVID-19.[5] Obesity worsens outcomes from COVID-19, including tripling the risk of hospitalization due to a COVID-19 infection.[6] A large-scale study published in August 2020 found that people with obesity who contracted COVID-19 were 113% more likely than people with healthy weight to be hospitalized, 74% more likely to be admitted to the ICU, and 48% more likely to die.[7] In short, Mr. York's obesity places him at serious risk of severe illness should he contract COVID-19. Mr. York also suffers from asthma, using an inhaler daily, which he keeps on his person, and he has high blood pressure. Ex. A at 5,[8]7.  The CDC warns that asthma and high blood pressure are risk factors and that individuals with these conditions may be at increased risk of severe illness from COVID-19.[9]

---

[5] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[6] *Obesity, Race/Ethnicity, and COVID-19*, CDC https://www.cdc.gov/obesity/data/obesity-and-covid-19.html

[7] Meredith Wadman, *Why COVID-19 is more deadly in people with obesity-even if they're young*, Science Mag, Sept. 8, 2020 https://www.sciencemag.org/news/2020/09/why-covid-19-more-deadly-people-obesity-even-if-theyre-young

[8] Santa Rita Jail records show Mr. York's recent blood pressure at 136 over 100, Larouche Decl. ¶ 2, Ex. A at 5, which per the American Heart Association Blood Pressure Categories, places Mr. York in hypertension stage 1 and stage 2, respectively. *See Reading the new blood pressure guidelines,* Harvard Health Publishing, June 1, 2020, https://www.health.harvard.edu/heart-health/reading-the-new-blood-pressure-guidelines.

[9] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Mr. York also has a serious lung condition. He has been diagnosed with sarcoidosis since 2012. Ex. A at 2. According to the Mayo Clinic, "Sarcoidosis is a disease characterized by the growth of tiny collections of inflammatory cells (granulomas) in any part of your body — most commonly the lungs and lymph nodes. But it can also affect the eyes, skin, heart and other organs."[10] Mr. York has sarcoidosis of the lung and the disease initially attacked his vision, hindering his ability to see. *Id.* Consistent with the Mayo Clinic's description of sarcoidosis lung symptoms, Mr. York experiences shortness of breath and wheezing.[11] *Id.* Also consistent with the Mayo Clinic's list of complications, he has experienced long-term issues in the way of permanent scarring on his lungs, *see id.* at 3, which further hampers his breathing.[12] Research on the relationship between COVID-19 and sarcoidosis is still quite limited, but the Stanford Medicine Sarcoidosis Program notes that because of the pulmonary involvement in most sarcoidosis patients:

> This may put them at a higher risk than the general population, or even other patients with rheumatic diseases being prescribed immunosuppressive medications. Sarcoidosis patients may have baseline decreased lung capacity and fibrosis related to granulomas. Likewise, treatment for sarcoidosis generally involves immunosuppression, which potentially results in increased susceptibility to infectious diseases. Side effects of immunosuppression—in particular glucocorticoids such as prednisone—are linked to diabetes and hypertension. These comorbidities are frequently cited as factors that appear to put patients at an increased risk for complications related to COVID-19. The mechanism for this association remains unclear. Given the complex interplay between sarcoidosis/granuloma formation, the immune system, and new antigens like COVID-19, patients and providers need to weigh the evidence for continuing, modifying, or ceasing therapy for sarcoidosis.[13]

As mentioned in the Stanford article, Mr. York takes Prednisone to decrease his immune system's response and help him breathe. *See* Ex. A at 7. He also takes a medication to treat autoimmune diseases, Hydroxychloroquine (Plaquenil). *Id.* How these medications could affect Mr.

---

[10] *Sarcoidosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sarcoidosis/symptoms-causes/syc-20350358.

[11] *Id.*

[12] *See id.* at "Complications."

[13] *Immuno-suppressive Treatments For Sarcoidosis During a Viral Pandemic: A review of the evidence*, Stanford Medicine, Stanford Sarcoidosis Program Blog and Research Updates, Aug. 7, 2020, https://med.stanford.edu/sarcoidosis/blog-and-research-updates.html

York's ability to fight off COVID-19 and what is the proper treatment for him should he contract COVID-19 present further uncertainty and risk. Although some research suggests a not significantly different rate of COVID-19 infection among those with sarcoidosis,[14] at least one study found that moderate or severe impairment in pulmonary functions is associated with mortality in sarcoidosis patients infected with COVID-19.[15] Mr. York's propensity for respiratory failure due to his diminished pulmonary reserve, lung damage from the disease, and treatment that suppresses immune system functioning, creates significant risks for his health in connection with COVID-19.[16]

Mr. York faces a final risk factor because he is African American. Research, including that cited by the CDC, has established that racial and ethnic minority groups, including African Americans, are being disproportionately affected by COVID-19.[17] Black people are dying at 1.5 times the rate of white people and account for 16% of COVID-19 deaths where race is known.[18]

In sum, Mr. York faces serious, numerous risk factors that place his life in peril while he remains in custody. As the Court is keenly aware, the pandemic is far from over and the conditions for those in custody place inmates and staff at heightened risk because social distancing guidelines are near impossible to follow.

## II. The PSR Incorrectly Calculates Mr. York's Base Offense Level Because the Government Has Not Met Its Burden to Show the Second Cited Offense is a "Controlled Substance Offense"

Mr. York objects to the PSR's calculation of his base offense level at 24 because the second

---

[14] *Sarcoidosis and COVID-19 Survey Update*, Foundation for Sarcoidosis Research, Oct. 20, 2020, (Noting that results from a large questionnaire of sarcoidosis patients suggest "an increased rate of COVID-19 infection in sarcoidosis patients. However when compared to non sarcoidosis patients in the same area and time of the study, the rate of COVID-19 was not significantly different.") https://www.stopsarcoidosis.org/covid-19-survey-update/.

[15] Adam S. Morgenthau et al., *Moderate or Severe Impairment in Pulmonary Function is Associated with Mortality in Sarcoidosis Patients Infected with SARS-CoV-2*, Lung (2020) 198:771-775, Sept. 11, 2020, https://link.springer.com/article/10.1007%2Fs00408-020-00392-9.

[16] *See* Hanae Ramdani et al., *COVID-19 pneumonia in a patient with sarcoidois: A case report*, Clinical Case Reports, Dec. 23, 2020, https://onlinelibrary.wiley.com/doi/10.1002/ccr3.3684; Praveen Govender & Yvette C. Cozier, *Sarcoidosis in a time of pandemic*, Eur Respir J 2020; 56: 2002376 https://doi.org/10.1183/13993003.02376-2020.

[17] *Health Equity Considerations and Racial and Ethnic Minority Groups*, CDC, July 24, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.

[18] *COVID-19 is affecting Black, Indigenous, Latinx, and other people of color the most*, The COVID Tracking Project at The Atlantic, https://covidtracking.com/race (last accessed Jan. 25, 2021).

cited offense is not a controlled substance offense. PSR ¶ 23 (citing U.S.S.G. §2K2.1(a)(2)). While

Mr. York's 2007 conviction for a violation of California Health & Safety Code (CHSC) 11351.5 is a

controlled substance offense, the government has not met its burden of showing Mr. York's May

2011 conviction for a violation of CHSC 11351, is a controlled substance offense. *See United States v.*

*Romero-Rendon*, 220 F.3d 1159, 1160 (9th Cir. 2000) (stating government's burden to prove factors

enhancing a sentence).

The Sentencing Guidelines define "controlled substance offense" as:

> an offense under federal or state law, punishable by imprisonment for a term
> exceeding one year, that prohibits the manufacture, import, export, distribution, or
> dispensing of a controlled substance (or a counterfeit substance) or the possession
> of a controlled substance (or a counterfeit substance) with intent to manufacture,
> import, export, distribute, or dispense.

U.S.S.G. §4B1.2(b); §2K2.1, Commentary Application Note 1, Definitions. Contrary to the

government's contention that the defense raises "a purely technical defense," the defense at issue is

based on the well-accepted and required categorical approach. To determine whether one's prior

conviction is satisfies a definition triggering a sentencing enhancement, the Court applies the

categorical and modified categorical approach described in *Taylor* and its progeny. *United States v.*

*Leal-Vega*, 680 F.3d 1160, 1163 (9th Cir. 2012) (analyzing whether defendant's prior conviction was

a drug trafficking offense under the sentencing guidelines as to trigger a base offense level increase)

(citing *Taylor v. United States*, 495 U.S. 575 (1990)). The statute at issue here, CHSC § 11351,

criminalizes:

> posses[ion] for sale or purchases for purposes of sale (1) any controlled substance
> specified in subdivision (b), (c), or (e) of Section 11054, specified in paragraph
> (14), (15), or (20) of subdivision (d) of Section 11054, or specified in subdivision
> (b) or (c) of Section 11055, or specified in subdivision (h) of Section 11056, or (2)
> any controlled substance classified in Schedule III, IV, or V which is a narcotic
> drug.

Analyzing this California statute, the Ninth Circuit has held that it is categorically broader than a

federal offense involving a "controlled substance," because "California's list of controlled substances

includes one or more substances not controlled by federal law." *Medina-Lara v. Holder*, 771 F.3d

1106, 1112 (9th Cir. 2014); *see United States v. Leal-Vega*, 680 F.3d 1160, 1167 (9th Cir. 2012)

1   (considering whether CHSC § 11351categorically qualified as a "drug trafficking offense," as

2   defined under the Sentencing Guidelines, which required it to interpret the term "controlled

3   substance offense," as used in the Guidelines definition).

4        The statute is divisible with respect to the type of controlled substance. *Lopez v. Sessions*, 901

5   F.3d 1071, 1075 (9th Cir. 2018). Accordingly, this Court moves to the modified categorical

6   approach, which requires it "to determine 'whether the facts proven at trial or admitted by the

7   defendant as part of his guilty plea establish that the defendant was convicted of *all the elements* of

8   the relevant federal generic offense.'" *Id*. (quoting *United States v. Torre-Jimenez*, 771 F.3d 1163,

9   1167 (9th Cir. 2014) (emphasis added)). Pursuant to the United States Supreme Court's decision in

10  *Shepard v. United States*, 544 U.S. 13, 26 (2005), the Court must reviews documents that show what

11  the defendant necessarily pleaded to or was found guilty of. This includes, "the terms of the charging

12  document, the terms of a plea agreement or transcript between judge and defendant in which the

13  factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of

14  this information." *Id*.

15       Here, the government has not provided a charging document that shows Mr. York was charged

16  with CHSC § 11351 and which might show to what controlled substance Mr. York necessarily

17  pleaded guilty. There is an abstract of judgment that shows Mr. York pleaded to "Count 3." But, the

18  charging document for the case number only includes a Count 1 and a Count 2. In other words, the

19  government has not provided the typical *Shepard* documents required to show what Mr. York

20  necessarily pleaded guilty to in order to establish a categorical match to a federal controlled

21  substance offense. The government attempts to make up for this gap of information by pointing to a

22  certified preliminary hearing transcript at which the prosecutor orally requested an additional charge

23  against Mr. York—CHSC § 11351—the same statute to which Mr. York later pleads guilty. The

24  government contends that the transcript is analogous and of equal reliability of a charging document

25  or similar *Shepard* document and therefore, established that Mr. York's offense is a controlled

26  substance offense.

27       The preliminary hearing transcript does not, however, show that the defendant "'necessarily

28  admitted [the] elements of the generic [federal] offense,'" because it does now show that he

necessarily admitted to the element of a drug that is covered under the federal CSA. *Descamps v. United States*, 570 U.S. 254, 262 (2013) (citing *Shepard*, 544 U.S. at 26). Typical *Shepard* documents, the list albeit non-exhaustive, include the terms of the charging document, the terms of the plea agreement, the plea colloquy, or factual basis in the plea, because they all focus on what the defendant *necessarily* pleaded guilty to. This legal limitation, rather than relying on a review of one's criminal record, or surmising what could have occurred, is important to eliminate guesswork that triggers serious consequences. *See Descamps*, 570 U.S. at 267 (stating that the Court adopted the elements-centric "formal categorical approach" in part to avoid Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that property belong to juries and to avoid practical difficulties and potential unfairness of a factual approach). In addition, the defense does not agree that there is no factual dispute that the substance was indeed cocaine salts as the government contends. Dkt. 49 at 5:20–23. Several drugs are discussed in the *officers' testimony* during the preliminary hearing, but Mr. York makes no admission at the preliminary hearing as to what drug was involved and there is no later plea hearing transcript or factual basis from which to discern what substance he might have pleaded guilty to.

The Ninth Circuit does not appear to have opined on whether a preliminary hearing transcript suffices as a *Shepard* document to determine what a defendant necessarily pleaded guilty to. The California Supreme Court, however, has recently considered the issue and held that the trial court failed to comport with the principles underlying *Descamps* and went beyond the bounds of the Sixth Amendment when it relied on a transcript from a preliminary hearing to conclude the defendant used a deadly weapon, a necessary element that triggered consequences under the state's recidivism sentencing scheme. *People v. Gallardo*, 4 Cal. 5th 120, 136 (2017). *Gallardo* held that typical *Shepard* documents like indictments and jury instructions "differ from the preliminary hearing transcript here in a meaningful way." *Id*. (citing Descamps, 133 S.Ct. at 2279). While "[a]n indictment or jury instructions might help identify what facts a jury necessarily found in the prior proceeding," "a defendant's preliminary hearing transcript *can reveal no such thing*." *Id*. (citing *Shepard*, 544 U.S. at 20–21) (emphasis added). "[I]n the absence of any pertinent admissions, the sentencing court can only guess at whether, by pleading guilty [to a violation], defendant was also

1  acknowledging the truth" of any testimony that would indicate he committed the offense with the

2  triggering element, in *Gallardo*'s case, with a dangerous weapon. *Id*. *Gallardo* held that relying on

3  the preliminary hearing transcript to determine the defendant's prior conviction was an

4  "impermissible inquiry to determine 'what the defendant and state court judge must have understood

5  as the factual basis of the prior plea.'" *Id*. (citing *Descamps*, 133 S.Ct. at 2284). The triggering facts

6  had to be admitted by the defendant or found by a jury; a preliminary hearing could not show that. *Id*.

7      At least one circuit court has adopted the same view. *United States v. Medina-Almaguer*, 559

8  F.3d 420 (6th Cir. 2009). In *Medina-Almaguer*, the court determined whether a defendant's CHSC §

9  11352(a) prior was a "drug trafficking offense," which would trigger an enhancement in his illegal

10  entry after deportation offense. *Id*. at 422. Citing to *Shepard* and applying the categorical approach,

11  the court determined first looked to the typical *Shepard* documents—the abstract of judgment and

12  guilty plea—but found they did not establish whether the defendant committed a "drug trafficking

13  offense." *Id*. at 424. In analyzing whether the reliance on a preliminary hearing transcript to make

14  that determination was proper, the court highlighted that the role of the preliminary hearing is the

15  "gateway step in the criminal process: determining whether probable cause exists for detaining a

16  suspect before a potential indictment or information." *Id*. That testimony showed there was

17  "sufficient cause" to believe the defendant violated the statute, did not mean that the defendant

18  admitted to the specific conduct later when he pleaded guilty. *Id*. Put concisely, "it does not follow

19  that the transcript establishes the facts that he 'necessarily admitted' when he later pleaded guilty."

20  *Id*. The Sixth Circuit refused to make a bright-line that preliminary hearing transcripts could not be

21  relied upon in this context, but held the transcript before it did not identify the conduct the defendant

22  necessarily pleaded guilty to and so did not suffice to trigger the sentencing enhancement for a "drug

23  trafficking offense." *Id*. at 424

24      *Gallardo* and *Medina-Almaguer*'s reasoning apply here. The statute at issue is overbroad as to

25  drug type and the abstract of judgment and charging document do not include the type to establish

26  whether Mr. York's crime is a controlled substance offense. The government asks the Court to rely

27  on the preliminary hearing transcript, which it has not filed with its memorandum, wherein the state

28  prosecutor asked to "add a count for 11351 and 11378 for the other narcotics that were tested positive

for methamphetamine and cocaine salt, and that the defendant possesses them for sale based on the testimony and the evidence presented by" testifying sergeants. Mr. York did not testify. Mr. York did not make any pertinent admissions. There is no plea colloquy available to show Mr. York adopted any facts in the preliminary hearing transcript. A preliminary hearing is held to establish probable cause and the judge did find probable cause as to the charges against Mr. York—a violation of CHSC § 11352, CHSC § 11377(a), and CHSC § 11351. But, a probable cause finding is just that. It does not show the facts that the defendant *necessarily* pleaded guilty to or what a jury necessarily found as to an element of the offense, here, drug type. *See Descamps*, 570 U.S. at 267.

"*Shepard* requires more than probable inferences and likely implications." *Medina-Almaguer*, 559 F.3d at 425. "It requires a judicial record that identified the facts a defendant 'necessarily admitted' in entering a guilty plea." Here, the judicial record fails to establish that Mr. York necessarily pleaded guilty to an offense for a substance that falls within the federal definition and CSA. Finally, to the extent that there is ambiguity, it is resolved in the defendant's favor where the government bears the burden of proof. *See Marinelarena v. Barr*, 930 F.3d 1039, 1053 (9th Cir. 2019) (en banc).

**III.   Even if the Court Finds the Base Offense Level is 21, a Variance is Warranted Because the Significant Impact of the Sentencing Enhancements is a Disproportionate Penalty**

Even if the Court finds Mr. York has two prior controlled substance offenses, the sentencing guidelines enhancement of 10 offense levels because of two possession/purchase for sale drug offenses that occurred 10 years ago, is a disproportionate penalty and a variance is warranted. *See* PSR ¶¶ 23, 44, 46. The available facts of both offenses do not suggest violence of high-level drug distribution. For the 2007 CHSC § 11351.5 possess/purchase cocaine base for sale conviction, there are no facts regarding the offense and Mr. York received a sentence of 3 years. PSR ¶ 44. For the 2011 CHSC §11351 possess/purchase for sale conviction noted by probation, Mr. York was caught with narcotics on his person after a street-level police buy/bust operation. PSR ¶ 46. Mr. York received a sentence of 2 years. *Id*. Throughout Mr. York's life, he has only sold drugs to maintain his own drug habit and addiction.

The effect of these dated prior convictions is significant. Without counting the contested 2011

CHSC §11351 conviction, Mr. York's guidelines would be 51 to 63 months. If the even older 2007 conviction was not counted, Mr. York's offense level would be 12 and guidelines after acceptance would be 24 to 30 months. In other words, the low-end of Mr. York's offense level increases by 53 months because of dated offenses that stem from Mr. York's own drug addiction. Taking into account the staleness of the offenses, the conduct, and the link to Mr. York's substance abuse, a punishment of 53 months higher is a disproportionate penalty.

## IV. A Downward Variance is Warranted Because African American Men are Disproportionately Convicted and Incarcerated for Firearm Possession (18 U.S.C. § 3553(a)(6))

Mr. York should not have had a firearm and accepts responsibility for his offense. How he became an individual not permitted to carry a firearm, how he was targeted in this offense, and the criminal justice system's treatment of African American men, like Mr. York, should still be considered. African American individuals, are charged, sentenced, and incarcerated at alarmingly disparate rates when it comes to federal gun offenses.

The United States has the highest prison population rate in the world, incarcerating one in five of the world's prisoners.[19] Black individuals are more than five time as likely to be imprisoned as white men.[20] The relevant sentencing guideline here, §2K2.1, is disproportionately used to sentence and incarcerate Black individuals. *See* Declaration of Lisa Tarasyuk in Support of Defendant's Sentencing Memorandum (Tarasyuk Decl.), Table 2. Individuals who identify as Black or African American make up 13.4% of the total population in the United States, but make up 48.9% of all defendants sentenced under 2K2.1 nationwide. Tarasyuk Decl., Tables 1, 2. The statistics in the Northern District of California (NDCA) are even more staggering: only 5.6% of NDCA population is Black, yet 57.6% of defendants sentenced under 2K2.1 in NDCA are Black. *Id*. **NDCA is sentencing Black individuals under 2K2.1 at more than ten times their rate in the population.**

---

[19] Wagner and Bertram, *"What percent of the U.S. in incarcerated?" (And other ways to measure mass incarceration*, Prison Policy Initiative (January 16, 2020), https://www.prisonpolicy.org/blog/2020/01/16/percent-incarcerated/; *see also* Roy Walmsley, *World Prison Brief: World Prison Population List*, Institute for Crim. Policy Rsch. (12th ed. 2020), https://www.prisonstudies.org/sites/default/files/resources/downloads/wppl_12.pdf

[20] Ashley Nellis, *The Color of Justice: Racial and Ethnic Disparity in State Prisons*, The Sentencing Project (June 14, 2016), https://www.sentencingproject.org/publications/color-of-justice-racial-and-ethnic-disparity-in-state-prisons/

**Table 2: Racial Composition of Sentencing Data and Individual Guidelines**

| Region | Race | N[21] | Sentencing Data | §2D1.1 | §2G2.2 | §2K2.1 | §2K2.1 (2016 –19) |
|--------|------|-------|-----------------|--------|--------|--------|-------------------|
| National | Black | 210157 | 21.39% | 27.39% | 3.21% | 48.94% | 52.77% |
| | White | 248077 | 25.25% | 24.41% | 85.58% | 29.94% | 25.43% |
| | Hispanic | 476737 | 48.53% | 44.9% | 8.85% | 18.21% | 18.79% |
| Ninth Circuit | Black | 12337 | 6.55% | 6.66% | 2.56% | 22.96% | 26.77% |
| | White | 47855 | 25.42% | 24.95% | 80.23% | 36% | 32.31% |
| | Hispanic | 111430 | 59.19% | 60.39% | 12.04% | 30.81% | 31.01% |
| Northern California | Black | 1918 | 23.7% | 21.55% | 4.69% | 57.6% | 54.73% |
| | White | 2028 | 25.06% | 18.17% | 72.27% | 14.92% | 14.53% |
| | Hispanic | 3022 | 37.34% | 48.92% | 13.28% | 22.43% | 25.68% |

Ten years ago, Michelle Alexander labeled this disparity and the structures that perpetuate it "The New Jim Crow." The statistic above and mass incarceration are a result of a confluence of factors consciously or subconsciously founded upon structural racism. Growing up black, from an impoverished background, with parents dealing with substance abuse, and likely living in an over-policed community, it is not a surprise that Mr. York is before the Court on a possession of gun charge.

"Federal programs have existed for twenty-six years to ensure the most aggressive enforcement of gun laws and have been set up to systemically target Black communities." Emma Luttrell Shreefter, *Federal Felon-in-Possession Gun Laws: Criminalizing a Status, Disparately Affecting Black Defendants, and Continuing the Nation's Century-Old Methods to Disarm Black Communities*, 21 CUNY L. Rev. 143, 160 (2018). [22] U.S. Attorneys' offices collaborate with local police departments to prosecute offenders in federal court, to "face 'the full force of federal sentences with a commitment to no plea bargaining.'" *Id*. In addition, Black individuals are convicted of felonies and thus susceptible to a "felon in possession charge" at disproportionate rates. *See id*. In this district, we see the US Attorney's office transferring numerous cases from state court to federal court

---

[21] Total number of cases, without double counting the final column on §2K2.1 from 2016-2019.
[22] https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=1459&context=clr

where individuals face harsher sentences. This happened in Mr. York's case after he was arrested in July 2020 and moved to federal custody two months later. PSR at 1. The processes of determining which cases are transferred is unclear. However, the impact on black defendants who face more serious sentences in federal court is notable.

Another factor at play is policing. The Department of Justice operates Project Safe Neighborhoods which, "targets Black communities and disparately impacts Black defendants." Shreefter at 163. "This disparate impact is evidenced by two practices: the targeted implementation of this project in certain jurisdictional districts, and the federal prosecutors' imbalanced exercise of their discretion to remove cases from state court and to indict under the might of federal law." *Id*. In this case, Mr. York was arrested after police officers were patrolling the Bayview neighborhood and recognized Mr. York from prior contacts. This type of targeting policing and the black box of prosecutorial discretion continues to target Black defendants, without a modicum of transparency or accountability. The U.S. Attorney's Office in NDCA has rejected defense attorneys' requests for basic statistics regarding the race of those prosecuted and convicted, claiming they do not keep such data.

Racial disparities extend into sentencing and incarceration for those under the gun guideline. Black defendants nationally, in the Ninth Circuit, and in NDCA, are less likely to receive a downward variance compared to White Defendants. Tarasyuk Decl., Table 5. For the available data of all individuals sentenced under 2K2.1 in NDCA, 35.15% of Black defendants receive a below-guideline sentence as compared to 44.59% of White defendants—a 9% difference. *Id*. While the group of those with the same Criminal History Category of VI and Offense Level of 21 as Mr. York in NDCA is limited to 57 defendants, there are also troubling signs of disparities. *Id*., Table 6. Of the 57 defendants in this group, 39 are Black and 5 are White. *Id.* Despite this difference in number of Black and White defendants overall, the same number of Black and White defendants received a sentence of 36 months or below—2. *Id*. **In other words, 2 of the 5 White defendants received a sentence of 36 months or less, but only 2 of the 39 Black defendants received the same**. *Id*. Further, Black defendants in this group received a variance 9% less than that of their White counterparts. *Id*.

The impact of policing, prosecutorial discretion, and higher sentences is evidenced in the number of black defendants imprisoned for offense under 2K2.1. Nationwide, an estimated 61% of individuals sentenced under 2K2.1 who are currently in custody are Black. Tarasyuk Decl., Table 4.

The data above is an alarming, though sadly not shocking, display of disparities, especially in NDCA and with regard to 2K2.1. This Court should consider this backdrop and the way in which Mr. York's race plays a role in bringing him before the Court today at his guideline levels.

## V.     Mr. York's Present Offense is Serious, but is Best Understood in the Context of his History of Addiction, Which Also Explains his Criminal History

On July 22, 2020, at 10:50 p.m., San Francisco Police officers dressed in plain clothes were patrolling the Bayview neighborhood. PSR ¶ 6. One officer observed two individuals standing on the sidewalk, talking. PSR ¶ 7. The officer claims to have recognized Mr. York from prior contacts and states he was aware of Mr. York's felony probation with a warrantless search condition. PSR ¶ 7. The officer stood 10 to 15 away until he states he heard the words "gun" and "I want to buy," and saw Mr. York with cash in his hand. PSR ¶ 8. Mr. York began to notice that he was being watched. Not recognizing the plain-clothes officers as police and given his concern for safety in the neighborhood, Mr. York began walking away. PSR ¶ 10. Officers started walking and then running after Mr. York. PSR ¶ 11. The officers state they yelled for Mr. York to stop and identified themselves as police officers, but Mr. York was not able to hear those warnings. The officers claim that at some point, they saw "the black grip of a pistol in his right hand as he continued to sprint away from the officers." PSR ¶ 12. Mr. York readily accepts responsibility for having a gun, but denies that was he running with a gun in his hand that in any way was in the direction of officers. *See id*. Indeed, it was 10:50 p.m., the officers and Mr. York were sprinting, and the officer claims to have seen the black grip of the pistol in Mr. York's hand. Further, the firearm was found discarded, next to Mr. York, still in a holster, which does not support the narrative that Mr. York somehow was sprinting, took the firearm out of holster, and then put it back into the holster before discarding it. One can imagine that if Mr. York was running with a gun and holding it in any threatening way toward officers, his encounter would have ended very differently with him being shot at by police officers. Surely, black men have been shot for less. Rather, Mr. York was running, collided into a parked vehicle, fell, stumbled, and

he admits that the then discarded the pistol that he had on his person and in a holster. *See* PSR ¶¶ 12–13.

Once the officer chasing Mr. York reached him, he tackled him, and punched him in the face in an effort "to overcome the defendant's resistance and effect an arrest." PSR ¶ 14. Due to his injuries, Mr. York was taken to the hospital. PSR ¶ 14. The defense is not aware of any information as to whether the other individual that was allegedly involved in the "gun" and "want to buy" conversation was arrested or prosecuted.

At 41 years old, Mr. York has law enforcement contacts dating back to when he was 15. *See* PSR ¶ 60. This early contact with law enforcement is the result of challenges during his upbringing and growing up in the Bayview neighborhood, marked by prevalence of gangs, violence, and law enforcement surveillance. Mr. York's later contacts with law enforcement and resulting convictions arise out of his substance abuse mainly for possessing narcotics or participating in minor sales to fund his own addiction. *See* PSR ¶ 35–47.

Mr. York does have two prior convictions for gun possession. However, the timing of these offenses is notable. In 2014, Mr. York was staying at hotel when a fight broke out in the lobby and he found a gun and shot *it in self-defense*. He was charged with murder and *presented a self-defense claim; the jury agreed with him and acquitted him* on the murder charges. PSR ¶ 48. Because he had a gun and was a felon, he was found guilty of unlawful possession of a firearm and received a steep sentence of six years, for which he served half time. PSR ¶ 48. The family of the man that was shot was affiliated with the Mexican Mafia and after Mr. York was acquitted, the family threated and targeted him. Thereafter, Mr. York began to fear for his safety. He had no prior gun or violent convictions before 2014. In 2018, Mr. York was also found in possession of a firearm and sentenced to two years prison, at half time. PSR ¶ 49. Again, underlying this offense was Mr. York's substance abuse as he was using drugs daily at that time.

## VI.   The Court Should Consider Mr. York's Caretaking Responsibilities of his 94-year-old Father in Finding a Departure or Variance is Warranted

Pursuant to U.S.S.G. §5H1.6 Family Ties and Responsibilities, the Court may consider Mr. York's obligation to care for his 94-year-old father as a grounds for a departure or variance. Prior to

his arrest, Mr. York was a caregiver for his elderly father. Larouche Decl., Ex. C Letter of Carolyn York. Mr. York's father cannot care for himself and Mr. York would cook meals for him, feed him, dress him, bathe him, clean the home, and take his father to medical appointments. *Id*. His sisters have been doing the best to care for his father while he has been incarcerated, but at 75 and 68 years old with their own health issues, they greatly miss and need the support of Mr. York for their father's care. *Id*. Section 5H1.6 includes a provision for the circumstances here. A departure is warranted based on loss of caretaking, because a sentence within the guideline range "will cause a substantial, direct, and specific loss of essential caretaking . . . to the defendant's family." U.S.S.G. §5H1.6, cmt. n.1(b)(i). The loss of caretaking substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant, because the caretaking needs of Mr. York's father are immense given his age and health conditions. *Id*. at (ii). Mr. York's other siblings have limited capacity to provide care due to age and illness. His nephew works full-time and cannot provide the full-time care needed. Mr. York is the best-equipped person to care for his father and there is "no effective remedial or ameliorative programs reasonably available, making [Mr. York's] caretaking . . . irreplaceable to the defendant's family." *Id*. at (iii). Also, due to the dangers of the COVID-19 pandemic, his father is at increased risk and the family has been trying to reduce the number of visitors in the father's home, which causes further caretaking challenges. In short this Court can and should consider Mr. York's responsibilities to care for his father in finding a downward departure or variance is warranted.

**VII. Mr. York Objects to the Scope of the Recommended Condition Three, the Search Condition, Because Allowing for a Search of his Computer/Cellphone is a Greater Deprivation of his Liberty than Necessary.**

Courts may impose supervised release conditions "if they are reasonably related to the goal of deterrence, protection of the public, or rehabilitation of the offender." *United States v. T.M.*, 330 F.3d 1235, 1239–40 (9th Cir. 2003) (citing 18 U.S.C. §§ 3583(d)(1) and 3553(a)). Conditions must also "involve no greater deprivation of liberty than is reasonably necessary to achieve those goals" and be consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to § 994(a). *United States v. Napulou*, 593 F.3d 1041, 1044 (9th Cir. 2010); 18 U.S.C. § 3583(d)(2), (3). As to conditions involving computer searches, the Ninth Circuit has held that search conditions that encompass computers should rest on a "properly supported factual finding from the record before

[the district court], establishing some nexus between computer use and the need for the sentence imposed to accomplish deterrence, protection of the public, or rehabilitation of the defendant." *United States v. Bare*, 806 F.3d 1011, 1013 (9th Cir. 2015); *see also United States v. Lee*, 687 F. App'x 584, 586 (9th Cir.), cert. denied, 138 S. Ct. 216 (2017) (vacating and remanding same computer-search condition because "there is no evidence on the record establishing a nexus between computer use and the need for the sentence imposed to accomplish deterrence, protection of the public, or rehabilitation of [the appellant]") (citing *Bare,* 806 F.3d at 1013).

Here, there is no nexus between Mr. York's offense and any computer use. There is no evidence in the record showing that Mr. York used a cellphone or computer as related to this offense. Accordingly, there is no nexus to show how a search condition on his electronic devices would be *reasonably related* to the goals of deterrence, protection of the public, or rehabilitation. Further, given the particular privacy concerns with data stored on cell phones, *see Riley v. California*, 573 U.S. 373, 393 (2014), such a search condition would involve a greater deprivation of liberty than is reasonably necessary. Therefore, the following language should be struck from the recommended condition three, "or any property under your control, including any computers, cell phones, and other electronic devices."

### CONCLUSION

For the foregoing reasons, Mr. York respectfully requests that the Court vary or depart downward and sentence him to a custodial term of 36 months followed by 2 years of supervised release with a condition for substance abuse treatment. Such a term would be equivalent to the high-end of the guidelines if Mr. York was not being punished per 2K2.1 for two prior offenses involving narcotics that occurred over 10 years ago. Mr. York's personal history and characteristics, his need for substance abuse treatment, his father's caretaking needs, and the racial disparities at play further warrant a significant downward variance or departure in this case. A sentence focused on rehabilitation, rather than long-term incarceration, is sufficient but not greater than necessary to achieve the goals of sentencing.

1

2      Dated:      April 7, 2021                              Respectfully submitted,

3                                                             GEOFFREY A. HANSEN
4                                                             Acting Federal Public Defender
                                                              Northern District of California
5
                                                                          /S
6                                                             ELISSE LAROUCHE
                                                              Assistant Federal Public Defender
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28