GEOFFREY HANSEN
Acting Federal Public Defender
ELISSE LAROUCHE
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:     415.436.7700
Facsimile:     415.436.7706
E-mail:         elisse_larouche@fd.org

Counsel for Defendant YORK

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DARRIOUS YORK, <br><br> Defendant. | Case No. CR 20-479 EMC <br><br> **DEFENDANT'S REPLY TO UNITED STATES' RESPONSE TO DISCOVERY ORDER** |

The defense submits the following briefing to address the government's response to the Court's discovery order regarding § 922 gun cases transferred from state to federal court and to provide additional data and information to assist the Court in considering racial disparities in § 922 gun cases.

**I.     BACKGROUND**

On April 14, 2021, Defendant Darrious York was before this Court for sentencing after he pleaded guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). In response to disturbing statistics about racial disparities in the application of the United States Sentencing Guideline governing federal gun-possession sentences, § 2K2.1, the Court ordered additional briefing on the following topics:

(1) In the past 12 or 24 months, how many § 922 gun cases were transferred from state to

federal court and the racial breakdown of those defendants;

(2) The criteria used by the U.S. Attorney's Office ("USAO") in deciding whether to transfer such a case from state to federal court;

(3) The state sentence likely to be imposed under the circumstances charged in the instant case; and

(4) Whether information on racial sentencing disparities may be considered under the 18 U.S.C. § 3553(a) sentencing factors.

Dkt. 60.

After the government moved for reconsideration, the Court rescinded the portion of its order requiring the government to provide criteria for deciding whether to transfer a case from state to federal court. Dkt. 77. But the Court held that the remaining information was relevant to the sentencing factors, and again ordered the government to produce it. *Id.*

In response to the third topic, the government stated that for the parallel state offense, Mr. York would be facing a sentence of 16 months, two years, or three years of imprisonment, and that aggravating or mitigating factors could be considered by the state court when exercising its sentencing discretion among those three options. Dkt. 75 at 3. The defense provided a declaration from a San Francisco County Public Defender setting forth that the most severe sentence Mr. York could receive was three years served at half time, resulting in 18 months in custody. Dkt. 74 at 2, 74-1, Grant Decl.

On July 2, the government produced the remaining information required by the Court's order. The government reported that it charged 244 defendants with a violation of 18 U.S.C. § 922 from June 1, 2019 through June 1, 2021. Dkt. 81 at 3. The government clarified that there is "no established process by which cases are 'transferred' from state court to federal court" and set forth various manners in which a case with conduct charged at the state level could arrive in federal court. *Id*. The government stated that it did not internally track which cases were transferred from state court and that "federal prosecutors do not systematically record in the case file whether they were even aware of the underlying state charges, much less whether that awareness contributed to their charging decision." *Id*. at 4. Relying on the U.S. Marshals Service's "federal booking files," the government reported that the demographics of the 244 defendants charged with violations of § 922 were: 55% Black, 35% White,

7% Asian/Pacific Islander, and 2% Native American.[1] *Id*. at 5. The government reported that 61% (148 defendants) were transferred from state court. Of those cases where racial demographics were available, the demographics of the transferred defendants were: 55% Black, 31% White, 11% Asian/Pacific Islander, and 2% Native American. *Id*. Because the U.S. Marshals' data did not break out Latinx and/or Hispanic demographics, the government's report lacked that information. *Id*.

## II.     DEFENSE DATA REGARDING § 922(g) CASES

The defense also undertook a review of § 922(g) cases charged in this district between 2019 and 2021. It conducted this review by identifying defendants charged with § 922(g) offenses on ECF, analyzing the information of defendants represented by the Federal Defender's Office and contacting relevant counsel for the remaining defendants.[2] The defense found 245 applicable cases, **78% of which had prior county cases**.[3] In the Northern District, the demographics of defendants who had a county case were: 56% Black, 13.1% White, 19.9% Hispanic, 8.4% Asian or Pacific Islander, and 1.6% Native American. Dkt. 85, Tarasyuk Decl. ¶ 9. Of the **San Francisco venue-only cases (139 cases), 84% had county cases**. *Id*. Within that group (of San Francisco venue defendants with county cases), the demographics were: 60.7% Black, 14.5% White, 14.5% Hispanic, 6.8% Asian or Pacific Islander, and 2.6% Native American. *Id*.

## III.    INFERENCES FROM THE PARTIES' DATA

- **Disparate prosecution of Black individuals -** The government's data and the defense's data show that at least 55% of those charged with § 922 gun cases are Black, despite the Black population making up only 5.6% of the Northern District's population. In raw numbers, the defense's data shows that 107 Black defendants have had their cases transferred from state court, compared to only 25 White defendants. Dkt. 85, Tarasyuk Decl. ¶ 9

- **Disparity is even worse in San Francisco** – The defense's data shows that a higher percentage of all San Francisco venue cases involve Black defendants (59.7%) than at the district level. *Id*. Of those with county cases, 60.7% are Black, compared to 14.5% White and 14.5% Hispanic. *Id*. Of cases in which the San Francisco Police Department

---

[1] Of the 244 cases identified, 126 individuals were Black. Because for 15 cases race data was not available, the 15 was subtracted from the 244 and percentages are based on the resulting 229 cases for which race data was available.

[2] Specifically, the defense reviewed § 922(g) cases in ECF from January 1, 2019 to May 1, 2021. Dkt. 85, Tarasyuk Decl. ¶ 4-6. The defense gathered the list of § 922(g) cases from an ECF export report, which only reported cases with an indictment or information filed (excludes cases with only complaints or cases with charging documents under seal during the time period).

[3] The defense found 251 applicable cases, but only analyzed 245 cases because 6 cases had missing race data. Dkt. 85, Tarasyuk Decl. ¶ 9.

*US v. York,* Case No. CR 20-479 EMC                          3

(SFPD) authored the arrest report, 73% involve Black defendants as compared to 6.4% involving White defendants. *Id*. In raw numbers, 71 Black defendants have had their cases transferred from state court, compared to only 17 White defendants. *Id*.

- **Defense data shows higher percentage of transferred cases -** The defense's data suggests that there is a much higher percentage of cases—78% compared to the government's 61%—that are transferred from state court to federal court. *Id*.

- **Government's response fails to account for Latinx/Hispanic population** - The government's response was based on U.S. Marshals federal booking files data that does not break out the Latinx/Hispanic population. This likely had the effect of grouping the Latinx/Hispanic population as White, and therefore inflated the number of White defendants the government reported. The government's data showed 35% of all § 922 gun defendants were White and 31% of those with county cases were White. The defense's data showed 11.4% of all defendants were White and 23.3% were Hispanic; and of those with county cases, 13% are White and 19.9% are Hispanic.

- **More information is needed** – to determine the root of the disparate impact on Black defendants in § 922(g) gun cases and to see whether the U.S. Attorney's office's selection of cases to prosecute from state courts unduly impacts Black individuals, this Court needs additional information about the demographics of defendants charged in state court. Without knowing the eligible pool of individuals from which the U.S. Attorney's office could have chosen to prosecute, it remains unclear whether the U.S. Attorney's office may be disproportionately selecting Black defendants for federal prosecutions.

### IV. THE ROLE OF LOCAL POLICING IN FEDERAL GUN PROSECUTIONS

This Court has not been presented with statistics of the demographic breakdown of the § 922(g) eligible population on the state level in the District, which would shed light on any disparate selection or impact on Black defendants being prosecuted at the federal level.[4] Despite the clarity that such inforamtion would provide, it is important to note that the §2K2.1 disparity is not novel in this District. In fact, the Federal government appears to have been consistently prosecuting Black defendants disproportionately at least since *Booker*. Dkt 85, Tarasyuk Decl. ¶ 29. Every single year since *Booker*, from 43% to 69% of §2K2.1 defendants were Black in this District. *Id*. Last year (from January 1, 2020 to September 30, 2020), 63% of defendants were Black. *Id*. The government states that there is no set method through which a state case is transferred federally. But even an arbitrary or non-uniform practice that results in such high percentages of Black individuals being prosecuted is troubling and merits further inquiry.

---

[4] Although such answers would be more readily available to the government, the defense is working to obtain such information through California Public Records Act requests.

*US v. York,* Case No. CR 20-479 EMC               4

Because 61% to 78% of federal § 922(g) gun cases originate in state court, data about local policing may provide insight into the cause of the overrepresentation of Black gun defendants in the federal system. Overpolicing minority communities, for example, may lead to inflated criminal histories and the disproportionate labeling of Black individuals as felons. Indeed, the defense found preliminary support for this theory when it learned that in San Francisco-venue cases, where the San Francisco Police Department authored the initial arrest report, 73% of defendants were Black, while only 6.4% were White. Dkt. 85, Tarasyuk Decl. ¶ 9.

The defense followed up on this finding by analyzing two sources of data regarding local policing: Police stop data collected through the Racial and Identity Profiling Act (RIPA) and SFPD Incident Reports Data showing incidents in San Francisco neighborhoods. The defense narrowed in on data from the Bayview-Hunters Point, Pacific Heights, Marina, and Haight-Ashbury neighborhoods.

SFPD Incident Report Data shows that the Bayview has the *lowest* proportion of arrests arising from initial incident. *Id*. ¶ 21-23. While there are a greater number of initial incident report codes generated in Bayview-Hunters Point, fewer arrests arising from initial incidents occurred there. *Id*. This data may suggest a high number of incidents in that neighborhood, but a lesser proportion of conduct from those incidents arising to the level resulting in arrest and possible overpolicing of that neighborhood.



Several important points also emerge from RIPA stop data.[5] First, relative to San Francisco's population (881,549 people), SFPD conducts a large number of stops (101,614 in one year). *Id*. ¶ 16. Second, SFPD stopped Black individuals on 25,405 occasions, even though the Black population of

---

[5] Because SFPD Incident Reports Data is coded to capture incident reporting and codes, as opposed to the number of individuals stopped, the defense also looked at RIPA stop data to better understand policing trends.

San Francisco is only 45,840 people. *Id*. ¶ 16. The stop rate for this group is far beyond that experienced by White individuals in San Francisco (35,454 stops for 357,027 people). Finally, in spite of this disproportionate policing given relative population size, the discovery rates for contraband are within a 1% differential for stops involving Black and White folks. *Id*. ¶ 15.

In sum, SFPD Incident Data and RIPA Stop Data suggest that the disproportionate prosecution rates of Black defendants in § 922(g) cases may be influenced by overpolicing in communities with larger Black populations.

## V.   CONCLUSION

Mr. York's appearance before this Court is a result of many factors—certainly his own choices, but also overpolicing of communities of color and the government's decision to pluck him from the state court system. Contrary to the government's arguments, he isn't asking for a sentencing discount just because he is Black, but for this Court to consider a racial penalty baked into § 2K2.1. Pursuant to 18 U.S.C. § 3553(a)(2)(A), he asks the Court to consider the sentencing disparities between similarly situated federal defendants and state court defendants (and to keep in mind that 60.7% of San Francisco defendants whose cases originated in state court are Black). The sentencing factors also require this Court to consider Mr. York's history and characteristics, which inextricably include the experiences he has had as a Black man living in the Bayview neighborhood in San Francisco. 18 U.S.C. § 3553(a)(1). In light of these factors, and the arguments in his sentencing memorandum, Mr. York respectfully requests that the Court vary downward and impose a sentence that recognizes his potential for rehabilitation and overcoming substance abuse.

Date: July 20, 2021                                Respectfully submitted,

                                                   GEOFFREY HANSEN
                                                   Acting Federal Public Defender

                                                          /S
                                                   ELISSE LAROUCHE
                                                   Assistant Federal Public Defender